IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KAREN J. WILSON,

Plaintiff,

v.                                                    Civil Action No. 1:08cv62
                                                      The Honorable Irene M. Keeley

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. Procedural History

Karen J. Wilson ("Plaintiff") filed an application for DIB on February 17, 2005 (R. 47). Plaintiff also filed an application for SSI on March 8, 2005 (R. 15). Plaintiff's applications were denied at the initial and reconsideration levels (R. 32-36) Plaintiff requested a hearing, which Administrative Law Judge Randall Moon ("ALJ") held on May 1, 2007, and at which Plaintiff, represented by Regina Carpenter, and James Ganoe, a Vocational Expert ("VE"), testified (R. 278-

348). On August 3, 2007, the ALJ entered a decision finding Plaintiff was not disabled (R. 15-25). Plaintiff made a timely request for review by the Appeals Council, and on November 29, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-7).

## II. Statement of Facts

On June 20, 2002, Plaintiff reported to a nurse practitioner, at Milan Puskar Health Right, that her asthma symptoms had worsened. Plaintiff's lungs were clear. She was diagnosed with asthma, hyperlipidemia, insomnia, and depression, for which she was prescribed Advair, Singulair, Ventolin, Trazodine, Fluoxetine, and Lipitor (R 197).

On September 25, 2002, Plaintiff reported to a nurse practitioner, at Milan Puskar Health Right, that she had experienced lightheadedness. Plaintiff's examinations were within normal limits. Plaintiff was diagnosed with vertigo. She was advised to alter her diet (R. 196-97).

Plaintiff was prescribed Advair and Ventolin for her asthma and Fluoxetine for her depression on October 23, 2002, by a health care provider at Milan Puskar Health Right (R. 195).

On January 23, 2003, Plaintiff presented to Milan Puskar Health Right with "no new complaints"; she requested refills on her prescriptions for her depression, hyperlipidemia, and asthma medications (R. 196).

On May 7, 2003, Plaintiff reported to a physician's assistant, at Milan Puskar Health Right, that she had experienced bilateral knee pain (R. 194). In a May 9, 2003, telephone call to Plaintiff, the physician's assistant discussed Plaintiff's previously reported knee pain and prescribed Naprosyn for treatment of that pain (R. 193).

Plaintiff was examined by Nurse Practitioner Myers, at Milan Puskar Health Right, on

August 18, 2003. Plaintiff reported increased asthma symptoms. She had no wheezes, but she stated she experienced difficulty in "catch[ing] [her] breath." Plaintiff reported no dizziness or lightheadedness. Plaintiff stated she'd been in an automobile accident in July, 2003. She had reduced complaints of neck pain. She reported left shoulder pain and left neck pain. Plaintiff's neck examination revealed point tenderness on her left cervical spine (R. 192). N.P. Myers found Plaintiff's extremities were "2+ reflexes, 2+ pulses" and without edema. N.P. Myers prescribed Rhinocort and an Albuterol inhaler for treatment of Plaintiff's asthma symptoms. She prescribed Lipitor for treatment of hyperlipidemia. She ordered a MRI of Plaintiff's head an neck (R. 191).

Plaintiff's August 18, 2003, lipid profile showed elevated levels of triglycerides and VLDL cholesterol (R. 208).

On August 21, 2003, Plaintiff had an x-ray made of her chest. There was "[n]o radiographic evidence of acute cardiopulmonary disease"; it was normal (R. 199).

Also on August 21, 2003, Plaintiff hematology lab work was normal (R. 207).

Plaintiff's September 25, 2003, cervical spine MRI was "essentially unremarkable" (R. 198).

On September 30, 2003, Plaintiff presented to Nurse Practitioner Myers, at Milan Puskar Health Right, and reported she had improved asthma symptoms. She stated she "still [had] intermittent [left] neck tightness" and pain, but she had no numbness or tingling (R. 191). N.P. Myers noted Plaintiff was alert and oriented, times three. She had no distress. Her lungs were clear. N.P. Myers diagnosed asthma, muscle strain, and hyperlipidemia (R. 190). N.P. Myers prescribed Vioxx, Fioricet, Flexeril, and Albuterol. Plaintiff was instructed to cease smoking, but she stated she was "not interested at this time" in stopping smoking (R. 189).

During an October 29, 2003, examination of Plaintiff, Nurse Practitioner Myers, at Milan

3

Puskar Health Right, noted Plaintiff's September 25, 2003, MRI of her cervical spine was normal. Plaintiff's examination was normal (R. 189).

On February 24, 2004, Plaintiff presented to Milan Puskar Health Right with complaints of chest tightness and left-side back pain. The Nurse Practitioner who examined Plaintiff noted her general appearance, skin, eyes, ears, oropharynx, heart, and abdomen examinations were normal. Plaintiff's neurological, musculoskeletal, and mental status systems were normal upon examination. Plaintiff was diagnosed with asthma exacerbation, for which she was prescribed an inhaler, and depression, for which she was prescribed Wellbutrin (R. 185).

On April 13, 2004, Plaintiff was examined by Dr. Fisher, at Milan Puskar Health Right, for right knee pain and right wrist ganglion cyst. Plaintiff reported she was having success in stopping smoking with treatment of Wellbutrin. Plaintiff's chest, lungs, and heart were normal. Dr. Fisher noted Plaintiff's asthma and depression were stable. He diagnosed chronic pain and ganglion cyst. He prescribed Wellbutrin and Prozac (R. 184).

On June 4, 2004, Dr. Frank Fumich, a resident at WVU Department of Orthopaedics, and Dr. Jaiyoung Ryu, a professor in that department, corresponded with Nurse Practitioner Myers about Plaintiff's complaints of a mass in her right wrist. They informed N.P. Myers that Plaintiff had a "volar ganglion over the right wrist," which caused pain. They recommended that Plaintiff have the cyst removed. Other than the cyst, Plaintiff was found to be neurovascularly intact (R. 132).

On June 18, 2004, a doctor at Milan Puskar Health Right examined Plaintiff for a referral to a physician for a right wrist ganglion cyst removal. The doctor noted Plaintiff's laboratory blood work results were within normal limits. Plaintiff reported Vioxx was not alleviating her knee pain. She stated she had painful varicose veins. The doctor noted Plaintiff's depression was stable.

Plaintiff was referred to a surgeon for consultation for surgery of her varicose veins. The doctor prescribed Wellbutrin for Plaintiff's smoking cessation; he also prescribed Trazodone (R. 183).

Plaintiff's June 21, 2004, lipid profile was normal (R. 201).

On November 23, 2004, Plaintiff presented to Milan Puskar Health Right and requested refills of her prescriptions; she was there for a follow-up examination for her low back pain as well. Plaintiff complained of low back pain with bilateral numbness and weakness. Plaintiff reported she had gone to physical therapy several years earlier when her back injury occurred. Plaintiff reported her right knee "[gave] out sometimes." Plaintiff reported her asthma was stable. Plaintiff still smoked. She informed Dr. Blandek she cared for her granddaughter. Dr. Blandek's examinations of Plaintiff's skin, eyes, ears, nose oropharynx, chest, lungs, heart, and musculoskeletal system were normal. Dr. Blandek noted Plaintiff had no spasms in her back and her reflexes were "+2" in her lower extremities, bilaterally. Dr. Blandek diagnosed Plaintiff with hyperlipidemia; low back pain, for which he gave Plaintiff literature about exercising; and asthma, for which he restarted Azmacort. Dr. Blandek "strongly encouraged 30 min. aerobic walking, 3-4 [times per] week" (R. 182).

On November 25, 2004, Plaintiff had a blood chemistry profile completed. Her cholesterol was high (240 in a 0-199 range); triglycerides were high (287 in a 30-200 range); and her LDL was high (132 in a 0-99 range) (R. 200).

On January 7, 2005, Plaintiff phoned Nurse Practitioner Myers, at Milan Puskar Health Right, and complained of painful varicose veins. N.P. Myers ordered a Venous Doppler study to be performed on Plaintiff (R. 180).

On January 7, 2005, venous duplex imaging was conducted on Plaintiff. It showed "[n]o evidence of right lower extremity deep venous thrombosis or venous insufficiency within the limits

of the examination" (R. 202, 230-32).

On January 10, 2005, Plaintiff had a follow-up appointment with Nurse Practitioner Myers at Milan Puskar Health Right. Plaintiff reported pain in both legs, right worse than left. Plaintiff described her leg pain as sharp. N.P. Myers reviewed the Venous Doppler study with Plaintiff; the results were negative. N.P. Myers prescribed Bextra and Keflex (R. 179).

On January 13, 2005, Plaintiff was treated by Nurse Practitioner Myers at Milan Puskar Health Right. She complained of migraine headaches and requested a prescription for Fioricet. N.P. Myers did not prescribe Fioricet as she noted that medication must be prescribed by a medical doctor. N.P. Myers noted Plaintiff had taken Prozac regularly (R. 178).

On January 20, 2005, Plaintiff requested a prescription for Fioricet from Dr. DeFazio at Milan Puskar Health Right. Dr. DeFazio diagnosed tension headaches (R. 225). Dr. DeFazio prescribed Lipitor for Plaintiff's hyperlipidemia; Fioricet for headaches; Detrol for overactive bladder; and Celebrex for "likely osteoarthritis" (R. 224).

On March 3, 2005, Plaintiff presented to Dr. DeFazio, at Milan Puskar Health Right, and requested refills on her medications. Dr. DeFazio noted Plaintiff's general appearance, skin, oropharynx, chest, lungs, neurological and mental status examinations were within normal limits. He noted her asthma was controlled; her lipids were elevated, but she was medicating with Lipitor; he renewed her prescription for Fioricet for treatment of her headaches (R. 177).

Plaintiff was admitted to Chestnut Ridge Hospital on March 22, 2005; she was released on March 24, 2005. Her diagnoses were as follow: Axis I – alcohol dependence, major depressive disorder, and nicotine dependence; Axis II – none; Axis III – dyslipidemia, osteoarthritis, and bladder spasms; Axis IV – "marital issues, legal problems, and relationship with daughter." Plaintiff's

admission GAF was listed as 20; her discharge GAF was 55 (R. 137).

Plaintiff's presenting problems were suicidal thoughts and ideations and significant alcohol consumption (R. 137). Plaintiff reported to Dr. Arvind Vasudevan and Dr. Rollynn Sullivan that she had been depressed for five or six weeks. She listed her "stressors" as her daughter having been arrested and her having to care for her granddaughter. She reported she was caring for her ex-husband, who was convalescing from a tracheotomy. Plaintiff stated she thought about "getting in a car and hitting a tree [or] a Mack truck." Plaintiff reported she drank a pint of "Jack Daniels every three days" in order to "pass out with medications." Plaintiff stated she had feelings of helplessness, hopelessness, and worthlessness (R. 139).

Plaintiff smoked one-half package of cigarettes per day. She used alcohol daily, but she did not use illicit drugs. Plaintiff was unemployed as she "quit" her job in the laundry service department of Ruby Memorial Hospital in January, 2005. Upon examination by Drs. Vasudevan and Sullivan, Plaintiff's neurological examination revealed intact cranial nerves, intact extraocular movements, 5/5 shoulder shrug, normal facial sensation, "2+" reflexes" in upper and lower extremities, and normal muscle strength in upper and lower extremities. Plaintiff's mental status examination showed she was in no acute distress; she was alert and oriented, times three. Plaintiff's speech and attention were normal. Plaintiff's memory, thought process, and thought content were normal. Plaintiff's judgment and insight were fair (R. 140).

Upon her release, Plaintiff was prescribed Effexor and Ativan. At that time, Plaintiff's medication intake included, in addition to Effexor and Ativan, Acamprosate, Albuterol, Detrol, Lipitor, Trazodone, Singulair, nicotine patch, and nicotine inhaler. Plaintiff could return to regular diet and activities, "as tolerated." Plaintiff was instructed to attend NA and AA meetings. Plaintiff

was also instructed to medicate with Antabuse, "until liver enzymes normalize[d]" (R. 137).

On May 9, 2005, Plaintiff was examined by Dr. Schum for varicose veins. She stated she had persistent leg pain. She did not realize relief from the pain when she changed positions; she did not have swelling (R. 258). Plaintiff's carotid, femoral, popliteal, and post tibial pulses were +2/+2. She was positive for varicose veins in both legs. She had no edema (R. 260). Dr. Schum diagnosed bilateral leg varicositis. He recommended Plaintiff treat this condition by wearing compression stockings. He instructed her to return as needed (R. 261).

On July 20, 2005, Plaintiff requested that Dr. Lutzi, a physician at Milan Puskar Health Right, refill her prescriptions. Dr. Lutzi's physical examination of Plaintiff was normal. Her muscle strength was 5/5 (R. 223). Dr. Lutzi noted Plaintiff's asthma was stable; her lipids were elevated. He prescribed Albuterol, Flovent, Lipitor, Prozac, Detrol, Clonidine, and Celebrex (R. 222).

On August 10, 2005, Plaintiff presented to Nurse Practitioner Kovacevic, at Milan Puskar Health Right, for a follow up examination. Plaintiff had no new complaints. Plaintiff had a normal gait; her extremity, neurological, and mental examinations were normal. Plaintiff was diagnosed with asthma, hyperlipidemia, depression, chest pain, and osteoarthritis (R. 221).

On August 18, 2005, Plaintiff had an exercise stress test/myocardial perfusion scan completed due to her complaints of midsternal chest pains. The impression as for normal left ventricular function and "normal myocardial perfusion scan, without evidence of myocardial ischemia or infarction" (R. 254). It was also noted that Plaintiff's ECG was negative and she had normal heart rate recovery after the exercise (R. 255). It was recommended, based on the results of the testing, that Plaintiff "[m]aintain active lifestyle under physician supervision . . . . Smoking cessation. Reduce weight by at least 20 lbs. Consider dietary/nutritional counseling. Lessen risks

from hyperlipidemia with appropriate healthy diet and regular exercise." Plaintiff was found to be at low risk for coronary artery disease (R. 256).

On September 9, 2005, Plaintiff was examined by a nurse practitioner, at Milan Puskar Health Right, for aggravation to her asthma, which was a result to her having moved to a different home that was positive " for mold and moisture." Plaintiff reported no chest pains. Plaintiff's blood pressure was 140/80. The nurse practitioner's examination of Plaintiff's chest and lungs showed no wheezes, rales, or rhonchi. They were clear. The nurse practitioner's examination of Plaintiff produced normal results. She had no extremity edema. Plaintiff was diagnosed with asthma, depression, and hyperlipidemia. Plaintiff was prescribed Singulair, Flovent, Albuterol, Prozac, Wellbutrin, and Lipitor. Plaintiff was instructed to return for care in three to four months (R. 219).

On October 6, 2005, Plaintiff presented to Dr. Minhaus at Milan Puskar Health Right. She reported muscle spasms for the past two weeks as a result of her having fallen down stairs two weeks earlier. Dr. Minhaus' examinations of Plaintiff's skin, eyes, ears, nose, oropharynx, neck, chest, lungs, heart, abdomen, and extremities showed normal results. Plaintiff's musculoskeletal and neurological systems were normal upon examination. Dr. Minhaus prescribed Ibuprofen for treatment of Plaintiff's low back pain (R. 218). Plaintiff reported her migraine headaches were infrequent; she had stopped smoking.. Dr. Minhaus diagnosed infrequent migraine headaches; hyperlipidemia and depression. He prescribed Fioricet, Lipitor, Prozac, and Trazadone (R. 217).

Dr. Rubenstein found Plaintiff's October 19, 2005, lumbar spine x-ray was normal (R. 154).

On October 20, 2005, Plaintiff requested that Dr. DeFazio, at Milan Puskar Health Right, prescribe Fioricet for tension headaches. He provided sixty tablets, with no refills (R. 176).

On October 23, 2005, Dr. Susan L. Garner, completed an Internal Medicine Examination of

Plaintiff. Plaintiff's presenting complaints were for low back pain, varicose veins in both legs, asthma, arthritis in both hands, and elevated cholesterol. Plaintiff reported she had been diagnosed with osteoarthritis in her low back and hands. Plaintiff stated she medicated with Celebrex, which "seem[ed] to help." Plaintiff informed Dr. Garner that she had morning stiffness that "tend[ed] to get [a] little bit better," but did not completely stop. Plaintiff reported she had never had surgery or injections. Plaintiff described her pain as "constant, throbbing," which awakened her from sleep at night. Dr. Garner noted Plaintiff's legs were positive for varicose veins. Plaintiff reported pain around the veins and spasms in her calves. Plaintiff reported she had never had surgery for her veins (R. 146). Plaintiff stated her legs and ankles swell but that she treated that condition by elevating her legs, which alleviated the swelling (R. 146-47). Plaintiff informed Dr. Garner that her asthma had worsened; she could "no longer walk more than 50 feet or up five stairs without becoming short of breath and having to stop." Plaintiff reported she had never been hospitalized for asthma; she did not have "much of a cough"; she wheezed daily. Plaintiff stated she had ceased smoking. She had one asthma attack per week. Plaintiff stated Albuterol "[did] help" alleviate her asthma symptoms. Humidity and dampness worsened her symptoms. Plaintiff was treating her high cholesterol with Lipitor, and she did not have any side effects from that medication (R. 147).

Dr. Garner noted she had reviewed the November 23, 2004, record of Milan Puskar Health Right, which showed Plaintiff's asthma was stable; the September, 2003, MRI of Plaintiff's cervical spine, which was unremarkable; the August, 2003, chest x-ray, which showed no radiographic evidence of acute pulmonary disease; and the January 7, 2005, Doppler evaluation, which showed "no evidence of right lower extremity DVT or venous insufficiency" (R. 148).

Plaintiff reported to Dr. Garner that she medicated with Albuterol inhaler, Pulmicort,

Fioricet, Trazodone, Flexeril, Lipitor, Singulair, Fluoxetine, Celebrex, Detrol, and Clonidine. Plaintiff stated she stopped smoking one month earlier (R. 147). Plaintiff's cardiovascular, gastrointestinal, genitourinary, and neurological systems were normal (R. 148). Upon physical examination, Dr. Garner noted Plaintiff presented without assistive devices or ambulatory aides. Plaintiff's gait was normal; she had no difficulty rising from a seated position or climbing up on and/or down from the examination table. Dr. Garner observed Plaintiff was comfortable in the seated and supine positions. Plaintiff could speak clearly and she could hear, understand, and follow instructions without difficulty (R. 148).

Plaintiff's height measured five feet, two inches; she weighed one-hundred and eighty-seven pounds. Plaintiff's blood pressure was 130/90. Dr. Garner's examinations of Plaintiff's head, eyes, ears, nose, throat, neck, abdomen, cervical spine, arms, knees, ankles, feet, and neurologic system were normal (R. 150). Plaintiff's extremities showed no dorsalis pedis, and her posterior tibial pulses were palpable, bilaterally. Plaintiff had no edema; her skin temperature and pigment were normal. Plaintiff did have right calf varicosities, where were "prominent, but . . . [were] not particularly tender or swollen" (R. 149). "She had good peripheral pulses in the lower extremities"; there was "no evidence of venous stasis, such as . . . . ulceration" (R. 150). Plaintiff was positive for light wheezes in both lungs, but she had no rhonchi or rales. Her air entry was equal, and she did not have prolonged expiratory phases (R. 149). Plaintiff was not hypoxic and she did "not become short of breath on exertion or while lying flat" (R. 150). The pulmonary function completed by Plaintiff on October 19, 2005, showed mild COPD (R. 150, 155). There was tenderness over Plaintiff's third right digit "at the proximal interphalangeal joint," which was associated with a Heberden node. Plaintiff was able to make a fist and extend her hands, bilaterally. Dr. Garner noted

Plaintiff had "no difficulty picking up a coin or writing with her dominant hand." Plaintiff's grip strength was 22 kg of force on the right and 20 kg of force on the left. Plaintiff had tenderness over the spinous processes of the lumbar spinal area (R. 148). She had no paravertebral muscle spasm; she was able to "anteriorly flex to only 30 degrees"; her lateral flexion was normal; she could stand on one leg at a time; there was no leg length discrepancy noted; she was able to perform the straight-leg raising test to "only 10 degrees on the right and 30 degrees on the left due to reproduction of her low back pain"; palpation to her hips revealed no tenderness; she could flex and extend her hips without difficulty (R. 148-49). Plaintiff's neurologic exam showed no weakness on manual muscle testing. Plaintiff's sensation was intact. Plaintiff's biceps, triceps, patellar, and Achilles deep tendon reflexes were graded at "2+/4+ throughout." Plaintiff could walk on her heels and toes, walk heel to toe, and squat without difficulty (R. 150).

Plaintiff's ranges of motion testing were normal for her wrist, elbow, knee, and shoulder, bilaterally. Plaintiff's hand had normal extremity strength, grip strength, and fine manipulation, bilaterally (R. 152). Plaintiff's hips, ankles and cervical spine ranges of motion were normal. Plaintiff's lower extremity strength was normal (R. 153).

Dr. Garner diagnosed the following: chronic low back pain, lower extremity varicosities, asthma, arthritis of the hands, and hyperlipidemia (R. 150).

On November 8, 2005, Jim King, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. King opined Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 116). Dr. King found Plaintiff could frequently climb ramps, stairs,

ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl (R. 117). Dr. King found

Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 118-19). Dr.

King noted that the medical evidence he reviewed of Plaintiff's "allegations of lower back pain,

arthritis in back and hands, varicose veins in both legs, asthma, high cholesterol . . . . would

"reasonability [sic] be expected to cause some reductions in his [sic] physical residual functional

capacity." Dr. King noted Plaintiff's "alleged restrictions on the Adult Function Report are NOT

entirely consistent with the degree of limitation indicated by the medical evidence." Dr. King opined

that Plaintiff's "complaints of pain seem[ed] out of proportion with the physical findings. She has

a normal lumbar XR and normal MRI of cervical spine. She walks with a normal gait, can arise

from a seated position and get on and off exam table without difficulty. She does have some lumbar

tenderness but there is no spasm[ ]. Yet her lumbar flex is only 30 [degrees] and Reduced SLR." Dr.

King found, however, that the "evidence [did] NOT support the degree of disability alleged by the

[Plaintiff]" and found her to be partially credible (R. 120).

On December 12, 2005, Frank Roman, Ed.D., completed a Psychiatric Review Technique

of Plaintiff. He found she had affective disorders and substance addiction disorders (R. 157). Mr.

Roman found Plaintiff's affective disorders was depressive syndrome, characterized by anhedonia,

decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking (R.

160). Plaintiff's substance addiction caused her affective disorders (R. 165). Mr. Roman found

Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social

functioning; and moderate difficulties in maintaining concentration, persistence, or pace (R. 167).

Mr. Roman reviewed Plaintiff's March 24, 2005, Chestnut Ridge discharge report in completing the

form (R. 169).

13

Also on December 12, 2005, Mr. Roman completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff was not significantly limited in her ability to understand and remember (R. 171). Mr. Roman found Plaintiff, in her abilities to sustain concentration and persistence, was not significantly limited in her ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; or make simple work-related decisions. Mr. Roman found Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 171-72). Mr. Roman found Plaintiff's social interaction was not significantly limited as to her ability to ask simple questions or request assistance, to maintain socially appropriate behavior, or to adhere to basic standards of neatness and cleanliness. Plaintiff's social interaction was moderately limited as to her ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors. There was no evidence of Plaintiff's being limited in her ability to get along with coworkers/peers without distracting them or exhibiting behavioral extremes. Mr. Roman found Plaintiff had no evidence of limitations in her adaptation – she could travel in unfamiliar places and use public transportation; she could set realistic goals and make plans independently of others. Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting, to be aware of normal hazards or to take appropriate precautions (R. 172).

Mr. Roman concluded that Plaintiff's limitations did not meet a listing; alcohol consumption

did not impact her ADL's; she was independent in her ADL's; and Plaintiff was able to "follow routine work activities in a low stress work setting" (R. 173).

On February 16, 2006, Nurse Practitioner Lisa Kovacevic, and Carole Renner, LSW, of Milan Puskar Health Right, wrote a letter, addressed "To Whom It May Concern," about Plaintiff's conditions. N.P. Kovacevic and M.S.W. Renner wrote that Plaintiff was "being followed by [their] clinic for depression, asthma, lower back pain, migraine headaches[,] dyslipidemia, and osteoarthritis. They opined that "some of [Plaintiff's] health issues [could] be taken care of" . . . "with medication and exercise" so that she could "exist without debilitating pain." N.P. Kovacevic and M.S.W. Renner found Plaintiff fell "when her legs [gave] out on her." They noted Plaintiff had made "progress with some of her health issues." N.P. Kovacevic and M.S.W. Renner wrote they did not "feel that [Plaintiff] should return to the workforce until all situations are completely mended," which may "not occur for many years" (R. 175).

On March 21, 2006, John E. Damm, Ed.D., CAC, a state-agency psychologist, reviewed the evidence of record and affirmed the opinion found in Mr. Roman's December 12, 2005, Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff (R. 209).

On March 28, 2006, Thomas Lauderman, D.O., a state-agency physician, reviewed all of the evidence found in the file and affirmed the opinions/findings contained in Dr. King's November 8, 2005, Physical Residual Functional Capacity Assessment of Plaintiff (R. 210).

Plaintiff was treated at Milan Puskar Health Right by Dr. Neraceri on February 8, 2006. Plaintiff reported she had continued low back pain, that she thought it was caused by arthritis and that she had fallen three months earlier. Plaintiff reported no leg pain, no numbness, no weakness in her lower extremities. Dr. Neraceri's examination of Plaintiff revealed normal oropharynx, chest,

lungs, neck, heart, abdomen, and neurological examinations. Plaintiff had full lumbar range of motion; she had full strength/sensation in her lower extremities; she had mild lumbar paraspinal tenderness to palpation. Dr. Neraceri diagnosed low back pain for the past three months. Dr. Neraceri provided Plaintiff "handout on lumbar stretches." Plaintiff's asthma was listed as "suboptimal control" (R. 216). Dr. Neraceri noted Plaintiff medicated with Singulair, Advair, Pulmicort, Albuterol, Prozac, Clonidine, and Trazodone. Plaintiff reported her "moods good on Prozac & Trazodone" and that her migraines were infrequent (R. 215).

On April 19, 2006, Plaintiff presented to Milan Puskar Health Right and reported her low back pain had stabilized. Plaintiff reported increased low back pain with increased activity and that she realized "good relief" from Celebrex and Flexeril. Plaintiff stated she continued to "do stretches for back." Plaintiff stated she had increased allergy symptoms, which resulted in increased wheezing and use of her inhaler. Plaintiff's skin, ears, oropharynx, chest, lungs, and extremity examinations were normal. Plaintiff's musculoskeletal examination was normal; she had full range of motion of her lumbar spine. Plaintiff had no edema; her mental status examination was normal. Plaintiff was diagnosed with "improving" lumbar strain, infrequent migraines, asthma, and stable depression. Plaintiff was prescribed Celebrex, Flexeril, Fioricet, Pulmicort, Advair, Albuterol, and Prozac for continued treatment of these conditions (R. 214).

On October 13, 2006, Plaintiff returned to Milan Puskar Health Right for refills on her prescriptions. Plaintiff reported deep pain in her right knee. Plaintiff stated she did not injure her right knee and that she believed she had arthritis in it. Plaintiff had no chest pain and reported her asthma was controlled with use of an inhaler. Plaintiff's skin, neck, chest, lungs, heart, and extremities were normal. Plaintiff's musculoskeletal examination was normal. Plaintiff's right knee

had full range of motion. It was nontender and without crepitus. Plaintiff had no edema in her extremities and her pedal pulses were 3+. Plaintiff was diagnosed with knee pain, stable asthma, stable low back pain, stable depression. She was prescribed Celebrex, Pulmicort, Advair, Albuterol, Flexeril, Prozac, Singulair, and Zyrtec and was instructed to return in four to five months (R. 213).

On March 20, 2007, Plaintiff presented to Milan Puskar Health Right and was examined by Physician's Assistant Mia Shilobod for follow-up for treatment of her asthma and depression. Plaintiff had no new complaints; she requested refills of her prescriptions. Plaintiff informed P.A. Shilobod that she had right knee pain and that her knee "'[gave] out.'" Plaintiff reported that her asthma symptoms "flare[d]" and that her depression was "'okay.'" P.A. Shilobod diagnosed stable asthma, knee pain, and hyperlipidemia and prescribed refills on Plaintiff's prescriptions (R. 211).

On March 22, 2007, Plaintiff had a MRI of her right knee (R. 262-65). The impression was for "[d]egenerative type tear of the posterior horn and body of the medial meniscus extending to the inferior articular surface, negative for displaced meniscal fragments"; "[m]ild tricompartmental osteoarthritic-type degenerative changes, most severe in the patellofemoral compartment, with grade 2 chondromalacia patellae"; and "[s]everal prominent varicose veins in the superficial subcutaneous soft tissues, posterior to the knee" (R. 264-65).

Administrative Hearing

Plaintiff testified at the administrative hearing on May 1, 2007. She stated she lived with ex-husband (R. 288). Plaintiff testified her twenty-five year old daughter and six-year old granddaughter had lived with her and her ex-husband for a period of time and had moved out a "couple of months ago." During that time, Plaintiff cared for her granddaughter (R. 289-90, 313, 314, 315). Plaintiff did not graduate high school; she completed school through the eighth grade;

17

she completed her GED (R. 295-96).

Plaintiff had worked in the warehouse at Gabriel Brothers; she worked as a cashier at WalMart (R. 306-07). Plaintiff stated she had worked at BFS Foods, where she was cashier and stocked the shelves (R. 302-03). Plaintiff testified that, in 2003, she worked for a cleaning service and cleaned banks. Her duties included sweeping, mopping, cleaning the desks, emptying garbage, and vacuuming (R. 300-01). Plaintiff testified that she had been employed in the laundry at West Virginia University Hospitals (late 2004), but had to quit the job because the work hurt her back and knee (R. 299-300). Plaintiff stated the laundry job was the job that she "liked . . . better than . . . the other jobs" because she was friends with her fellow employees (R. 317). Plaintiff testified she worked as a cook in a restaurant for one month one year earlier (R. 293). Plaintiff testified she had worked at Dollar General, as "primarily . . . a cashier" for "about a month and a half" in May or June of 2006 (R. 294). Plaintiff stated she had "[gone] through a lot of jobs"; when asked why she did not maintain those jobs, Plaintiff testified she "just hurt" due to migraine headaches and her knee "giv[ing] out on [her]" (R. 302). Plaintiff stated she told her doctors she could not work anymore; the doctors did not tell her to not work (R. 318).

The ALJ noted that Plaintiff's past jobs were jobs where walking, standing, and a "fairly significant amount of physical work" were required (R.320). Plaintiff stated she had not pursued jobs that did not require less physical activity because sitting caused her pain. She could not sit very long before she had to stand (R. 321).

Plaintiff testified that she could not work due to her "legs and back and . . . depression" (R. 317). Plaintiff stated the "main reason[s]" she did not work were her back and knee "problems" (R. 317). Plaintiff reported she had never had surgery on her back and was treated with medication (R.

18

307). Plaintiff testified she injured her knee when she fell; she stated she had arthritis in her knee (R. 309). Plaintiff stated she'd received physical therapy for her knee and she was instructed to wear a knee brace, which she did until she was told by Dr. Lively not to wear the brace due to her having varicose veins (R. 310). Plaintiff stated her asthma was "under control pretty good." Plaintiff reported she stopped smoking two months earlier (R. 311). Plaintiff testified she no longer drank alcohol (R. 316). Plaintiff stated that treatment of her depression with Prozac helped her feel better "sometimes" (R. 327).

Plaintiff testified she could not squat due to knee pain; her knee hurt when she sat (R. 311). Plaintiff testified that her leg hurt when she drove a car (R. 292). Plaintiff stated she had to stop working at Dollar General because her "legs and back bother[ed] [her] too bad" (R. 294).

When questioned by her lawyer, Plaintiff testified her knee pain was from "the top of [her] knee down" (R. 330). The pain was located in the back of her right knee; the pain was constant. Plaintiff listed her knee pain at eight on a scale of one to ten. Plaintiff testified her varicose veins hurt all the time in both legs, but that her right leg was worse (R. 331-32). Plaintiff listed her varicose vein pain at six on a scale of one to ten. Plaintiff testified her lower back pain started at waist level and continued into both hips. Plaintiff stated her back pain was present at all times. She stated that the pain was "ease[d]" by her lying down, which she did daily (R. 332). Plaintiff stated she would lie down at scheduled times – 1:00 p.m. and 5:00 p.m., for one hour each time (R. 333). Plaintiff testified that a symptom of her depression was that she cried every other day. Plaintiff reported experiencing spasms in her legs about three times per week. Plaintiff stated she experienced migraine headaches twice weekly (R. 334). Plaintiff testified she vomited and experienced light sensitivity when she had a migraine headache (R. 335). Plaintiff testified the cyst in her right wrist

caused lifting difficulties (R. 336).

Plaintiff stated she carried an inhaler with her and used a nebulizer as needed for treatment of her asthma (R. 312). Plaintiff testified she had received an injection in her knee and used ice to treat her knee pain (R. 311). Plaintiff testified she was treating her back pain with hydrocodone (R. 312). Plaintiff stated that she was instructed to seek mental health treatment through counseling after she was released from Chestnut Ridge Hospital in March, 2005, but she did not seek treatment by a psychiatrist (R. 316). Plaintiff testified she treated her depression with Prozac and Trazadone, which she received at Milan Puskar Health Right (R. 317).

Plaintiff testified she could walk on level ground for twenty or twenty-five feet before having to stop to rest; could stand for twenty minutes before having to sit for three or four minutes; after having sat for three or four minutes, Plaintiff could stand again for twenty minutes; and Plaintiff could sometimes sit for half an hour (R. 326).

Plaintiff testified she rose at 9:00 a.m.; drank a cup of coffee; "[sat] down for a while"; did the dishes; did the laundry; grocery shopped with her ex-husband once per month; visited with daughters on a regular basis; ate out in restaurants "once in a while"; visited with her brother at times; and had family come to her home for visits and for holiday celebrations (R. 321-26). Plaintiff testified she did not sleep through the nights; spasms awoke her (R. 321). Plaintiff testified she did not use the vacuum because it hurt her low back and legs (R. 322-23). Plaintiff testified she had a driver's license and she drove her ex-husband's car to the market, which was located within a mile of their home (R. 292). Plaintiff also testified the grocery store was fifteen to twenty minutes from her home and that she "hurr[ied] up and [got] them [the groceries] and [tried] to get out" of the store (R. 323-24). Plaintiff testified she and her ex-husband loaded and unloaded the groceries into and

out of the car. Plaintiff stated she had no hobbies (R. 324). Plaintiff testified she could dress herself,

except that bending down to tie her shoes caused her difficulty. Plaintiff reported she used a chair

in the shower (R. 329).

The ALJ asked the VE the following hypothetical question:

> I want you to assume that the claimant would have the ability to do medium work,
> would be . . . limited to simple routine, one to three step task . . . and be limited to
> jobs that would require no more than occasional contact with coworkers, supervisors
> and the general public. Would she be able to do her past relevant work? (R. 343).

The VE responded that Plaintiff would be capable of performing her past relevant work as

warehouse worker, laundry worker, and janitorial worker; she would not be capable of performing

the personal care giver job (R. 343).

The ALJ asked the VE if Plaintiff could perform her past relevant work with "other

limitations" and at the light level; the VE responded in the negative (R. 343).

The ALJ then asked the VE the following hypothetical questions:

> Would there be any full time, unskilled job such a hypothetical person . . . the same
> age, education and work experience as the claimant could do at the light work,
> limited to simple routine, one to three step tasks and jobs that would require no more
> than occasional contact with coworkers, supervisor and the general public? (R. 343).

The VE responded that the following jobs were available to Plaintiff: price marker, 319,000

nationally, 1,675 regionally; grader/sorter, 90,000 nationally, 1,000 regionally (R. 344).

The ALJ asked the VE the following hypothetical:

> I want you to assume a hypothetical individual, same age, education, work experience
> as the claimant that could do sedentary work, simple routine, one to three step task,
> jobs that would require no more than occasional contact with the general public,
> coworkers and supervisors, would there be any full time unskilled jobs such a
> hypothetical person could do in the local or national economy at the sedentary level?
> (R. 344).

The VE responded that the following sedentary work existed: ". . . a bench work, 103,000 nationally,

2,100 regionally. A general sorter, 25,000 nationally, 900 regionally" (R. 344).

The ALJ then asked the VE the following hypothetical question:

I want you to assume a hypothetical individual, same age, education, work experience
as the claimant that due to her impairments would be off task two hours out of an
eight-hour workday. Would there be any full time unskilled jobs such a hypothetical
person could do in the local or national economy? (R. 344).

To that question, the VE responded in the negative (R. 344).

The ALJ asked the VE the following hypothetical question:

Same question, but different limitation. The individual would be absent from work
three days a month on an ongoing basis due to her impairments. Would there be any
full time unskilled jobs such a hypothetical person could do in the local or national
economy? (R. 345).

To that question, the VE responded in the negative (R. 345).

The ALJ asked the VE the following:

With respect to the answers that you've given me at the light and sedentary levels,
if I further restrict that to claimant being, wouldn't be able to do, work in extremes
of hot or cold temperatures or atmospheres of high concentrations of smoke fumes,
dust or odors, would that, would your answers still be good or would that change
your answers? (R. 345).

The VE responded: "The answers for the light level would be the same, Your Honor. Under the

sedentary, I listed bench worker. . . . I'd have to reduce the numbers on that to half . . ." (R. 345).

The VE testified that the numbers of the light jobs would be changed if an at-will sit/stand

option were included in the hypothetical (R. 345-46). The number of light jobs would be reduced

to half; the number of sedentary jobs would remain the same (R. 346). The ALJ asked the VE the

requirements for on task and attendance in unskilled work; the VE stated that unskilled attendance

is "usually . . . up to the employer, but they usually allow between one and two days per month

absenteeism. They require the individual to stay on task at least 90 percent of the time" (R. 346).

<u>Received Subsequent to Hearing</u>

On April 23, 2007, Dr. Matthew Lively, an Associate Professor of Rheumatology, at the WVU Department of Medicine, corresponded with P.A. Shilabod, a physician's assistant at Milan Puskar Health Right, about his examination of Plaintiff for right knee pain. Plaintiff reported to Dr. Lively that she had had right knee pain for several years, but it had gotten worse since she fell in December, 2006. Plaintiff stated that activities, such as walking or deep knee bending, made her pain worse. Plaintiff informed Dr. Lively that her right knee did not lock and it did not give out, but it did occasionally swell. Plaintiff reported fifteen-to-twenty minutes of morning stiffness in her right knee; she stated she had difficulty and pain when she climbed or descended stairs or hills. Plaintiff stated she had undergone physical therapy for her right knee pain, but that therapy consisted primarily of stretching and not strengthening. Plaintiff reported she no longer did any "routine exercises" with or for her knee. Plaintiff informed Dr. Lively that she medicated her knee condition with Motrin and Celebrex, but did not realize "any improvement in her symptoms" (R. 276).

Dr. Lively opined that Plaintiff, upon examination, had "full active range of motion of her right knee with some pain noted in extension." Dr. Lively found "tenderness to palpation over the medial patellar facet." Her patellar grind test was positive. Plaintiff's right knee was "stable to valgus and varus stress without pain." Plaintiff's anterior drawer was negative; her Lachman test was negative. Plaintiff's McMurray testing caused patellofemoral crepitus, but there was no internal clicking. Plaintiff's muscle strength was 5/5 and was painful with resisted extension. Plaintiff's neurological testing confirmed normal reflexes and sensation in her lower extremities (R. 276).

Dr. Lively read Plaintiff's March, 2007, MRI of her right knee and noted she had a

"degenerative type tear of the posterior horn of the medial meniscus. She also has tricompartmental osteoarthritis, [which was] most severe in the patellofemoral compartment and associated with a grade 2 chondromalacia[1]." Dr. Lively found, however, that "her current symptoms [of] pain are primarily related to her chondromalacia." He "discussed the importance of the strengthening program for her knee as opposed to the stretching exercises." Dr. Lively injected Plaintiff's right knee with cortisone; instructed Plaintiff to treat her right knee pain with Tylenol instead of Motrin and Celebrex; and return in two weeks "for a possible repeat injection" if she experienced no "significant improvement" after the injection she received (R. 276).

On April 27, 2007, Plaintiff presented to the emergency department at Monongalia General Hospital for low back pain caused by a fall (R. 269). Plaintiff described her pain as being in the lumbar region and moderate. Plaintiff's gait was antalgic. The examination of Plaintiff's constitutional, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, and neurologic symptoms produced negative results (R. 271). Plaintiff was in no acute distress; she had bilateral lumbar tenderness; she had normal range of motion in her extremities; her sensation was within normal limits, times four; her motor strength was normal; her reflexes were normal; and her perfusion was within normal limits. The impression was for lumbar strain. Plaintiff was found to be stable and was discharged. She was instructed to follow up with her family physician in two weeks if she realized no improvement of her symptoms (R. 272).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

---

[1]Chondromalacia: Softening of the articular cartilage, most frequently in the patella. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 356.

regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Moon made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009 (R. 17).

2.    The claimant has not engaged in substantial gainful activity since March 22, 2005, the claimant's amended onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*) (R. 17).

3.    The claimant has the following severe impairments: degenerative joint disease and osteoarthritis of the right knee; low back pain syndrome; arthritis of the hands; and depression (20 CFR 404.1520(c) and 416.920(c)) (R. 17).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 18).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with no exposure to extremes in heat or cold; no exposure to high concentration of smoke, fumes, dusts, odors, gases, or other respiratory irritants; no more than occasional contact with co-workers, supervisors, and the general public (R. 19).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965) (R. 23).

7.    The claimant was born on March 19, 1961 and was 45 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963) (R. 23).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (R. 23).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 24).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966) (R. 24).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 22, 2005 through the date of this decision (20 CFR 404.1520(b) and 416.920(g) (R. 25).

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).   In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

The Plaintiff contends:

1. This decision must be reversed and remanded because the ALJ failed to account for all of [Plaintiff's] accepted impairments in his residual functional capacity assessment and resulting hypothetical questions to the vocational expert as required by the regulations of the social security administration and the case law of the Fourth Circuit (Plaintiff's brief at p. 5).

2. The ALJ's credibility determination is improper because the only two criteria he reviewed were the objective medical evidence and [Plaintiff's] daily activities (Plaintiff's brief at p. 6).

The Commissioner contends:

1. The ALJ properly assessed Plaintiff's residual functional capacity (Defendant's brief at p. 7).

## C. RFC

Plaintiff asserts that the ALJ's "decision must be reversed and remanded because the ALJ failed to account for all of [Plaintiff's] accepted impairments in his residual functional capacity assessment and resulting hypothetical questions to the vocational expert as required by the regulations of the Social Security Administration and the case law of the Fourth Circuit" (Plaintiff's brief at p. 5). Defendant asserts that the ALJ properly assessed Plaintiff's residual functional capacity (Defendant's brief at p. 7).

In his decision, the ALJ found Plaintiff had the following severe impairments: "degenerative joint disease and osteoarthritis of the right knee; low back pain syndrome; arthritis of the hands; and depression (20 CFR 404;.1520(c) and 416.920(c)) (R. 17). Based on those severe impairments and his consideration of the evidence of record, the ALJ found Plaintiff had the following RFC: ". . . to perform light work with no exposure to extremes in heat or cold; no exposure to high concentration of smoke, fumes, dusts, odors, gases, or other respiratory irritants; no more than occasional contact with co-workers, supervisors, and the general public" (R. 19).

Plaintiff argues that all of Plaintiff's severe impairments were not accommodated in the ALJ's RFC. Specifically, Plaintiff makes three allegations as to the ALJ's RFC: 1) "no specific limitations attributable to the restrictions caused by [Plaintiff's] low back pain syndrome or her arthritis of the hands or the moderate concentration difficulties"; 2) "none of the common limitations that could reasonably be attributed to these impairments, i.e. [sic] no sit/stand option required, no limitation to simple, routine, repetitive, unskilled work, no limitation to only fine manipulation"; and 3) "[t]hese impairments are simply unaccounted for in the ALJ's RFC determination" (Plaintiff's brief at p. 6).

As defined in 20 C.F.R. §§ 404.1545 and 416.941, a residual functional capacity is what the Plaintiff can still do despite her limitations. Plaintiff's RFC is an assessment based upon all of the relevant evidence. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Plaintiff's medical condition. Observations by treating physicians and psychologists of Plaintiff's limitations may be used in formulating the RFC, and these observations must be considered along with the medical records to assist the Commissioner in deciding to what extent the impairments prevent Plaintiff from performing particular work activities.

The ALJ's RFC includes limitations that accommodate Plaintiff's low back pain syndrome, arthritis in her hands, and moderate concentration difficulties as supported by the diagnoses, observations, and opinions of Plaintiff's treating, examining, and consultative physicians and psychologists. The ALJ considered the opinions and evidence of the following medical professionals in arriving at his RFC.

As to Plaintiff low back pain syndrome, the ALJ considered the findings of Dr. Garner, who

28

performed a consultative physical examination of Plaintiff on October 23, 2005. Dr. Garner noted Plaintiff ambulated without any assistive devices or aids. Her gait was normal. She had no difficulty arising from a seated position or climbing up onto and down from the examination table. Dr. Garner observed that the Plaintiff was comfortable while she was in both the supine and seated positions. Plaintiff had tenderness over the spinous processes in the lumbar spine, but she had no paravertebral muscle spasms. Plaintiff could only anteriorly flex to thirty degrees and her straight leg raising test was limited to ten degrees on the right and thirty degrees on the left due to pain (R. 20, 148-49). Plaintiff had good peripheral pulses in the lower extremities. Dr. Garner's diagnosis was for low back pain (R. 21). In addition to this evidence that was evaluated by the ALJ, the record of evidence contains the following findings made by Dr. Garner that support the ALJ's finding: Plaintiff's lateral flexion was normal; she could stand on one leg at a time; palpation to her hips revealed no tenderness; she could flex and extend her hips without difficulty; Plaintiff's neurologic examination showed no weakness on manual muscle testing; Plaintiff's sensation was intact; Plaintiff could walk on her heels and toes and walk heel to toe; Plaintiff could squat without difficulty; and Plaintiff's lower extremity strength was normal (R. 148-50, 153).

Dr. Lively conducted a consultative physical examination of Plaintiff on April 23, 2007. The ALJ considered his finding that neurologic testing of Plaintiff's lower extremities showed normal reflexes and sensation (R. 21).

The ALJ also considered the opinions of Dr. King, the state-agency physician, who completed a Physical Residual Functional Capacity Assessment of Plaintiff on November 8, 2005, and Dr. Lauderman, the state agency physician, who, on March 28, 2006, agreed with Dr. King's findings (R. 23, 115-22, 210). Dr. King found that Plaintiff could stand and/or walk for a total of

about six hours in an eight–hour workday and could sit for a total of about six hours in an eight-hour workday. Plaintiff, according to Dr. King, could frequently climb ramps, stairs, ladders, ropes, and scaffolds. Plaintiff could balance, stoop, kneel, crouch, and crawl frequently (R. 23, 116-17).

The ALJ noted that Plaintiff had been treated at the Milan Puskar Health Right clinic for her medical conditions (R. 21). As to her low back pain, Plaintiff was examined by Dr. Blandek on November 23, 2004, and had no spasms in her back; her reflexes were +2 bilaterally. Dr. Blandek provided Plaintiff with literature about exercising and "strongly encouraged" Plaintiff to walk three or four times weekly, for thirty minutes at a time (R. 182). On July 20, 2005, Dr. Lutzi's physical examination of Plaintiff was normal. Plaintiff's strength was 5/5 (R. 223). On August 10, 2005, it was noted, at Milan Puskar Health Right, that Plaintiff had a normal gait (R. 221). On October 6, 2005, Dr. Minhaus noted Plaintiff's musculoskeletal and neurologic systems were normal; he prescribed Ibuprofen for treatment of her low back pain (R. 218). On February 8, 2006, Dr. Neraceri found Plaintiff had full lumbar range of motion. She had full strength and sensation in her lower extremities. She had mild lumbar paraspinal tenderness to palpation. Dr. Neraceri diagnosed low back pain, and he provided Plaintiff a "handout on lumbar stretches" (R.216). On April 19, 2006, Plaintiff's musculoskeletal examination was normal. She had full range of motion of her lumbar spine. Plaintiff was diagnosed with "improving" lumbar strain.

Plaintiff reported to a medical professional, at Milan Puskar Health Right, that her low back pain had stabilized. She stated her low back pain would increase with activity, but that she realized "good relief" from Celebrex and Flexeril. Plaintiff stated she continued to "do stretches for back" (R. 214). On October 13, 2007, Plaintiff's musculoskeletal examination was normal (R. 213).

In addition to the opinions of Plaintiff's treating and examining physicians and the statements

of Plaintiff, the October 19, 2005, lumbar spine x-ray was normal (R. 154).

Relative to Plaintiff's low back condition and resulting pain, substantial evidence supports the ALJ's RFC that Plaintiff is capable of less than a full range of light work.

As to Plaintiff's hand arthritis, the ALJ's RFC reflects limitations that are supported by the evidence. The ALJ considered Dr. Garner's October 19, 2005, opinion that Plaintiff was able to make a fist and extend her hands bilaterally. The ALJ noted that Dr. Garner found Plaintiff had "some tenderness in the right third digit at the proximal interphalangeal joint that was associated with a Heberden node." According to Dr. Garner, Plaintiff was able to pick up coins and write with her dominant hand without difficulty (R. 21). Dr. Garner also noted Plaintiff's grip strength was 22kg on the right and 20kg on the left. Plaintiff's wrist ranges of motion were normal. Plaintiff's hands had normal extremity strength, grip, and fine manipulation, bilaterally (R. 148, 152). Plaintiff told Dr. Garner that she medicated her osteoarthritis in her hands with Celebrex and that that medication "seem[ed] to help" (R. 146).

The ALJ also considered Dr. King's November 8, 2005, finding that Plaintiff had no manipulative limitations (R. 23, 118-19). The ALJ acknowledged that, on March 28, 2006, Dr. Lauderman agreed with Dr. King's findings (R. 23, 210). Additionally, at the administrative hearing, Plaintiff did not list any activities or abilities that were limited because of her hand arthritis. Plaintiff testified, however, that a cyst in her right wrist caused her to experience difficulties when lifting (R. 336). Substantial evidence supports the ALJ's RFC finding as to Plaintiff's arthritis of her hand.

The Plaintiff claims that the ALJ did not accommodate moderate concentrations difficulties in his RFC of Plaintiff; she asserts he did not even assign the most common limitations to her RFC, such as a limitation to simple, routine, repetitive and unskilled work. The ALJ relied on the evidence

from Milan Puskar Health Right that showed that Plaintiff's treatment of depression was stable with medication. He also relied on the findings of the state-agency psychologist, who completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff. The ALJ also considered and evaluated Plaintiff's testimony in creating an RFC that accommodated her moderate concentration difficulties. None of this evidence contained findings or opinions that Plaintiff was limited to simple, routine, repetitive or unskilled work due to her concentration.

Plaintiff was treated for depression at Milan Puskar Health Right prior to and after she had received in-patient care at Chestnut Ridge Hospital. On April 13, 2004, Plaintiff's depression was stable (R. 184). On June 18, 2004, the doctor at Milan Puskar Health Right noted again that Plaintiff's depression was stable (R. 183). When a patient at Chestnut Ridge, Drs. Vasudevan and Sullivan opined Plaintiff was alert and oriented, times three. Her attention was normal. Her memory, thought processes, and thought content were normal (R. 140). As noted in the records from Milan Puskar Health Right, Plaintiff's mental examination was normal on August 10, 2005 (R. 221). Plaintiff reported to Dr. Neraceri, on February 8, 2006, that her moods were "good on Prozac and Trazodone" (R. 215). Plaintiff's April 19, 2006, mental status examination was normal, as noted in the treatment notes from Milan Puskar Health Right (R. 214). Plaintiff reported to a physician's assistant, at Milan Puskar Health Right, on March 20, 2007, that her depression was okay (R. 211). As noted above, Plaintiff did not complain of concentration difficulties when she was seeking treatment at Milan Puskar Health Right; she either reported her depression was not problematic or it was noted it was stable. It did not lead to or cause any concentration limitations.

It was Mr. Roman, the state-agency psychologist, who completed a Psychiatric Review Technique and Mental Residual Functional Capacity of Plaintiff on December 12, 2005, and who

found Plaintiff had moderate difficulties in maintaining concentration (R. 23, 167). Mr. Roman, nonetheless, opined Plaintiff, based on her abilities to sustain concentration, was not *significantly* limited in her ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; or make simple work-related decisions (R. 23, 171-72). Mr. Roman found Plaintiff was capable of "follow[ing] work activities in a low stress work setting" (R. 23, 173).

At the administrative hearing, Plaintiff testified that pain and depression were the main factors that limited her ability to work. Plaintiff did not testify that her pain and depression impaired her ability to concentrate. Plaintiff stated that Prozac "sometimes" made her fell better (R. 327). Substantial evidence supports the ALJ's RFC as to Plaintiff's concentration limitations.

Plaintiff's assertions that "none of the common limitations that could reasonable be attributed to . . . [Plaintiff's] impairments, i.e. [sic] no sit/stand option required, no limitation to simple, routine, repetitive, unskilled work, no limitation to only occasional fine manipulation" were included in the RFC and that Plaintiff's "impairments are simply unaccounted for in the ALJ's RFC determination" are without merit. Administrative law judges are not required to assign "common limitations" to a claimant's RFC; they are required to determine an individual's RFC, which includes only those limitations that are supported by the record of evidence. As noted above, the ALJ did not create an RFC for which Plaintiff's impairments were "simply unaccounted." Light work, by its very nature, accommodated Plaintiff's low back pain syndrome and arthritis of the hands. 20 C.F.R. 404.1567(b) defines light work as follows:

*Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

By the ALJ's making a finding of light work, Plaintiff's low back pain and hand arthritis were accommodated with limited lifting and pushing and pulling. Plaintiff's walking, standing, and sitting were accommodated as those abilities were supported by the record of evidence. There was no evidence that led the ALJ to believe that Plaintiff had a loss of fine dexterity or an inability to sit, stand, or walk for long periods of time, so his finding of light work is supported by substantial evidence. Additionally, Plaintiff's moderate concentration difficulties were accommodated in the RFC as she was limited to occasional contact with others. As noted above, Mr Roman found that, despite Plaintiff's moderate difficulties in concentration, she was capable of "follow[ing] work activities in a low stress work setting" (R. 23, 173).

When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (citing *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987). Based on the above analysis of the ALJ's decision and the record of evidence, the undersigned finds the ALJ's decision is supported by substantial evidence.

## D. Credibility

Plaintiff asserts that the ALJ's credibility analysis is improper because the only two criteria he reviewed were the objective medical evidence and Plaintiff's daily activities. The Commissioner contends that the "ALJ considered all of the evidence, including the objective clinical signs and laboratory findings, medications, opinions of the treating and examining physicians, and Plaintiff's testimony, before concluding that Plaintiff's testimony and statements were not fully credibly" (Defendant's brief at pp. 10 and 11)

In *Craig v. Chater*, 76 F.3d 585, 595 (1996), the Fourth Circuit mandated the following protocol relative to the consideration and analysis of an individual's complaints of pain:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

The ALJ, in the instant case, made the following finding: "After considering the evidence

of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms . . ." (R. 22). The undersigned finds the ALJ fully complied with the first step in *Craig*, *supra*; therefore, the ALJ was required to evaluate Plaintiff's complaints of pain in conformance with step two. In conducting step two of the analysis, the ALJ found the following:

> . . . [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

> The claimant has always been able to perform a wide range of activities of daily living. She is able to care for her granddaughter at times. She visits and has visitors, shops, and goes out to eat and drives a car. These activities are inconsistent with total disability (R. 22).

> SSR 96-7p provides, in part, the following:

> . . . [O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record. (*See* also 20 C.F.R. 404.1509.)

> A review of the ALJ's decision finds he complied with the mandates contained in the

credibility analysis of *Craig, supra*, and the criteria listed in SSR 96-7p and 20 C.F.R. 404.1529. Specifically, the ALJ considered and evaluated laboratory findings; the objective medical evidence of pain and statements, opinions, and diagnoses of Plaintiff's treating and examining physicians; her activities of daily living; medical treatment and medications used to alleviate pain; and Plaintiff's statements. His above decision as to Plaintiff's credibility is supported by the evidence of record.

In his decision, the ALJ considered the laboratory findings of record. He noted that Plaintiff's August 21, 2003, chest x-ray showed "no radiographic evidence of acute cardiopulmonary disease" and that her September 25, 2003, MRI of her cervical spine was "unremarkable." The ALJ considered Plaintiff's right lower extremity venous duplex imaging, which was performed on January 7, 2005, that showed "no evidence of right lower extremity deep venous thrombosis or venous insufficiency" (R. 20). The ALJ considered the pulmonary function test performed on Plaintiff, which showed "only mild chronic obstructive pulmonary disease." The ALJ also reviewed and evaluated Plaintiff's March 20, 2007, MRI, which showed a "tear of the posterior horn of the medial meniscus" and "tricompartmental osteoarthritis, most severe in the patellofemoral [sic] compartment and this was associated with a grade 2 chondromalacla" (R. 21). In addition to the laboratory tests considered and evaluated by the ALJ in support of his credibility analysis of Plaintiff, the record of evidence contains Dr. Rubenstein's finding that Plaintiff's lumbar spine x-ray, which was made on October 19, 2005, was normal (R. 154).

As noted by the Plaintiff, the ALJ considered the objective medical evidence of pain and the statements, opinions, and diagnoses of Plaintiff's treating and examining physicians in his credibility analysis. The ALJ evaluated the records from Chestnut Ridge Hospital relative to Plaintiff's admittance and treatment for suicidal thoughts and significant alcohol consumption. He noted that

Plaintiff's GAF improved from 20, at admission, to 55, "or moderate impairment," when she was released from that facility two days later (R. 18). The ALJ considered and evaluated the opinions of Mr. Roman, a state-agency psychologist, who found, on December 12, 2005, that Plaintiff's affective disorders resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. Mr. Roman also found that Plaintiff's was "independent in activities of daily living and [was] able to follow routine work activities in a low stress work setting" (R. 23). The ALJ also considered the statements and opinions of the medical professionals who treated Plaintiff for depression at Milan Puskar Health Right (R. 21). On September 30, 2003, it was noted that Plaintiff was alert and oriented, times three, and was in no distress (R. 190). On February 24, 2004, Plaintiff's mental status systems were normal (R. 185). On April 13, 2004, Plaintiff's depression was diagnosed as stable (R. 184). On June 18, 2004, Plaintiff's depression was diagnosed as stable (R. 183). On March 3, 2005, Plaintiff's mental status examination was normal (R. 177). On August 10, 2005, Plaintiff's mental status examination was normal (R. 221). On April 19, 2006, Plaintiff's mental status examination was normal and her depression was diagnosed as stable (R. 214). On October 13, 2006, Plaintiff's depression was diagnosed as stable (R. 213).

The ALJ considered and evaluated the opinions, statements, and diagnoses and the objective evidence relative to Plaintiff's physical conditions. The ALJ evaluated the evidence provided by Drs. Fumich and Jaiyoung as to Plaintiff right wrist ganglion cyst. Their June 4, 2004, examination showed Plaintiff's Allen test was negative, which showed there "was no communication with the vascular circuit." No erythema or redness surrounded the mass. Plaintiff was neurovascularly intact (R. 20). The ALJ evaluated the evidence of record which was provided by Dr. Garner, who

completed a consultative examination of Plaintiff on October 19, 2005. Plaintiff presented without assistive devices or ambulatory aids. Plaintiff's gait was normal and she had no difficulty arising from a seated position. She could climb up on and climb down from the examining table. Plaintiff was comfortable in both the seated and supine positions. Plaintiff was positive for tenderness over the spinous processes in the lumbar spine. She had no paravertebral muscle spasm, but she was "only able to anteriorly flex to 30 degrees" and she could only "perform a straight leg test to 10 degrees on the right and 30 degrees on the left" due to complaints of pain (R. 20). Dr. Garner noted Plaintiff's legs were positive for varicose veins, but they were "nontender and were without swelling or erythema" (R. 20-21). Plaintiff was able to make a fist and extend her hands, bilaterally. Plaintiff could pick up coins and she could write with her dominant hand (R. 21). Dr. Garner found Plaintiff's ranges of motion testing were normal for her wrists, elbows, knees, shoulders, hips, ankles, and cervical spine. She found Plaintiff's extremity strengths, both lower and upper, were normal (R. 152-53). The ALJ considered Dr. Garner's diagnoses of chronic low back pain, varicose veins in both legs, and arthritis of her hands (R. 21).

The ALJ also considered the opinions and diagnoses of Dr. Lively, who evaluated Plaintiff for right knee pain. Dr. Lively found Plaintiff had full active range of motion of her right knee. There was "some tenderness to palpation over the medial patellar facet and she had a positive patellar grind test." Plaintiff's knee was "stable to valgus and varus stress without pain." Plaintiff's anterior drawer and Lachman tests were negative. The ALJ considered Dr. Lively's opinion that Plaintiff's muscle strength was 5/5; her reflexes were normal; her sensation was normal in her lower extremities. The ALJ evaluated Dr. Lively's opinion that Plaintiff's pain was caused "primarily . . . [by] her chondromalacla." The ALJ also considered and evaluated Dr. Lively's treatment of

39

Plaintiff's knee pain: he injected a corticosteroid into her knee; recommended she treat her pain with Tylenol; and "advised [Plaintiff] of the importance of a [knee] strengthening program" (R. 21).

The ALJ considered the opinion of Dr. King, state-agency physician, who evaluated Plaintiff on November 8, 2005. Dr. King found that Plaintiff could perform medium work; Dr. Lauderman confirmed this finding on March 28, 2006 (R. 23). In addition to finding Plaintiff could perform medium work, Dr. King noted Plaintiff's "alleged restrictions on the Adult Function Report are NOT entirely consistent with the degree of limitation indicated by the medical evidence." Dr. King opined that Plaintiff's "complaints of pain seem[ed] out of proportion with the physical findings." He found she had a normal lumbar x-ray and normal MRI of cervical spine. She walked with a normal gait, could arise from a seated position and got on and off exam table without difficulty. She had some lumbar tenderness; she had no spasms. "Yet her lumbar flex is only 30 [degrees] and reduced SLR." Dr. King found, however, that the "evidence [did] NOT support the degree of disability alleged by the [Plaintiff]" and found her to be partially credible (R. 120).

The ALJ also considered the record of evidence as to Plaintiff physical complaints provided by the medical professional who treated Plaintiff at Milan Puskar Heath Right (R. 21). Plaintiff's physical examinations were within normal limits on September 25, 2002 (R. 196-97). Plaintiff's physical examination was normal on October 29, 2003 (R. 189). On February 24, 2004, Plaintiff's neurological and musculoskeletal examinations were normal (R. 185). On November 23, 2004, Plaintiff reported low back pain, but her examination revealed that she had no spasms and her reflexes were "+2" in her lower extremities (R. 182). On March 3, 2005, Plaintiff's physical examination was normal (R. 177). On July 20, 2005, Plaintiff's physical examination was normal and her muscle strength was 5/5 (R. 223). On August 10, 2005, Plaintiff had normal gait; her

extremity and neurological examinations were normal (R. 221). On September 9, 2005, Plaintiff's

physical examination was normal and she had no extremity edema (R. 219). On October 6, 2005,

when Plaintiff presented to Milan Puskar Health Right with complaints of muscle spasm in her back

due to her having fallen down the stairs two weeks earlier, Dr. Minhaus found Plaintiff's

musculoskeletal and neurological examinations were normal (R. 217). On February 8, 2006,

Plaintiff's physical and neurological examinations were normal. She had full lumbar range of

motions; she had full strength/sensation in her lower extremities; she had mild lumbar paraspinal

tenderness to palpation (R. 216). On April 19, 2006, Plaintiff's extremity examinations were normal;

her musculoskeletal examination was normal; she had full range of motion of her lumbar spine; she

had no edema (R. 214). On October 13, 2006, Plaintiff's musculoskeletal examinations was normal;

she had full range of motion of her right knee; she had no edema in her extremities; her pedal pulses

were 3+ (R. 213).

The ALJ also considered the opinions of a nurse practitioner and a licensed social worker,

at Milan Puskar Health Right, that Plaintiff "should not return to gainful employment until all [her]

. . . conditions are resolved" (R. 23). First, a nurse practitioner and a licensed social worker are not

acceptable medical sources, and the ALJ was not required to considered the opinions. See 20 CFR

416.913. The ALJ noted that the nurse practitioner and the licensed social worker were not accepted

medical sources; he did not agree with their opinions about Plaintiff's ability to work (R. 23).

Second, the opinion that an individual cannot return to work due to a disability is an opinion reserved

to the Commissioner. The opinion expressed by a nurse practitioner and a licensed social worker

relative to Plaintiff's disability is an issue reserved to the Commissioner because it is an

administrative findings that is dispositive of a case; *i.e.*, that would direct the determination or

decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. 20 C.F.R. 404.1527(3)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(e)(1). Such opinions that Plaintiff "should not return to gainful employment . . ." should not be accorded any special significance by the ALJ.

In addition to the above evidence, which was considered and evaluated by the ALJ, the record of evidence also contains the May 9, 2005, findings of Dr. Schum; a physician's recommendation following Plaintiff's August 18, 2005, exercise stress test; and the April 27, 2007, treatment notes from Monongalia General Hospital, all of which support the ALJ's finding as to Plaintiff's credibility. Dr. Schum found she had no swelling in her legs; her pulses were +2/+2. She had no edema. He recommended Plaintiff wear compression stockings for treatment of her varicose veins (R. 261). After Plaintiff completed her exercise stress test, it was recommended that she "[m]aintain active lifestyle under physician supervision"; stop smoking; reduce weight by at least twenty pounds; partake of a healthy diet; and exercise regularly (R. 256). Plaintiff presented to the emergency department of Monongalia General Hospital with low back pain, which was caused by a fall. The treating physician found she was in no acute distress; she had bilateral lumbar tenderness; she had normal range of motion in her extremities; her sensation was within normal limits; her motor strength was normal; her reflexes were normal; and her perfusion was within normal limits. Plaintiff's musculoskeletal and neurologic examinations were normal (R. 269-72).

The ALJ considered the medical treatment and the medications used by Plaintiff to alleviate

her pain. He noted her depression was treated with Effexor and Ativan when she was an in-patient at Chestnut Ridge Hospital. The ALJ also considered the evidence that Plaintiff was completing detoxification as an outpatient once she was released from Chestnut Ridge Hospital (R. 20). Plaintiff reported, on April 19, 2006, that she realized "good relief" for her low back pain from medicating with Celebrex and Flexeril (R. 214). As to her knee condition, the ALJ considered and evaluated Dr. Lively's comments to Plaintiff about the "importance of a strengthening program for her knees as opposed to a stretching exercise"; the corticosteroid injection to her knees by Dr. Lively; and his suggestion that she treat her knee pain with Tylenol. The ALJ also considered that the treatment notes form Milan Puskar Health Right consistently showed her depression was stable with prescribed medications (R. 21). He considered the evidence that, after she was discharged from Chestnut Ridge Hospital, she "received some therapy and medication treatment for depression from Milan Puskar Health Right Clinic" (R. 18). The record of evidence from Milan Puskar Health Right supports his finding as to the medical treatment provided and medications used to stabilize Plaintiff's depression. Even though Plaintiff testified at the administrative hearing that treatment of her depression with Prozac made her feel better "sometimes," Dr. Fisher noted Plaintiff's depression was stable on April 13, 2004 (R. 184, 327). On June 18, 2004, Plaintiff reported her depression was stable (R. 183). Plaintiff's mental examination was normal on August 10, 2005 (R. 221). On February 8, 2005, Plaintiff reported to Dr. Neraceri that her "moods were good on Prozac & Trazodone" (R. 215). On April 19, 2006, Plaintiff's depression was found to be stable; she was prescribed Prozac (R. 214). Again, in October, 2006, the doctor at Milan Puskar Health Right found Plaintiff's to be stable; she continued medicating with Prozac (R. 213).

As noted by Plaintiff her brief, the ALJ considered Plaintiff's activities of daily living and

her statement about her ability to perform those activities. Plaintiff asserts the ALJ took her testimony about her activities of daily living "out of context." Plaintiff writes that the ALJ found she could drive, but that her testimony was that she did "not drive very often . . . and that her ex-husband usually does the driving . . ." (Plaintiff's brief at p. 8). The ALJ did not make a finding contrary to Plaintiff's testimony, as Plaintiff's alleged. He found Plaintiff had "a driver's license and [drove] occasionally" (R. 18). Plaintiff asserts that Plaintiff "did not testify merely that she shop[ped]" but that she went "grocery shopping with her husband once a month" (Plaintiff's brief at p. 8). That is the exact finding the ALJ made. He noted Plaintiff "grocery shopped with her husband once a month" (R. 18). Plaintiff asserts that the ALJ made "generalizations" about Plaintiff's "visiting" and dining out. Plaintiff writes that she testified she saw her daughter about three times a month, visited with "her brother and her mother from time to time,"and ate our "once in a while" (Plaintiff's brief at p. 8). The ALJ did not make a finding that was in opposition to this testimony. The ALJ noted Plaintiff cared for her "granddaughter at times"; that her "oldest daughter [came] to visit her three times per month"; and that she went "out to eat and visit others occasionally" (R. 18, 19, 22). The ALJ also noted that Plaintiff rose at "9:00 a.m., fix[ed] coffee and [sat] for a period of time. She then [did] work around her home, wash[ed] dishes and [did] laundry" (R. 18). His finding that Plaintiff's "activities [were] inconsistent with total disability" is supported by substantial evidence (R. 22).

As to Plaintiff's statements about her pain, the ALJ acknowledged them as part of the treatment notes from Milan Puskar Health Right (R. 21). Plaintiff stated, on September 30, 2003, that she had "intermittent [left] neck tightness" but that she experienced no numbness or tingling (R. 191). On February 8, 2006, Plaintiff reported she had no leg pain and no numbness or weakness in

her lower extremities (R. 216). On April 19, 2006, Plaintiff stated her low back pain had stabilized and that she continued to "do stretches for her back" (R. 214). On March 20, 2007, Plaintiff reported she had no new physical complaints (R. 211). In addition to Plaintiff's statements to the medical professionals at Milan Puskar Health Right, the record of evidence contains Plaintiff's April 23, 2007, to Dr. Lively. She stated her right knee did not lock and it did not give out, but that it did occasionally swell (R. 276). Plaintiff testified at the administrative hearing that her back pain was present all the times, but she reported to the doctor at Milan Puskar Health Right, on April 19, 2006, that she realized "good relief" of her back pain by medicating with Celebrex and Flexeril (R. 332, 241). Additionally, Plaintiff testified, at the administrative hearing, that she experienced spasms in her legs about three times per week; she did not report leg spasms to the medical personnel who were treating her at Milan Puskar Health Right (R. 334).

For all of the above stated reasons, the undersigned finds that the ALJ's credibility analysis is supported by substantial evidence and that the ALJ specifically and thoroughly discussed his findings thereof.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment is **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___3rd___ day of ___June___, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE